IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH WRIGHT | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| RYOBI TECHNOLOGIES, INC, et al. | : | NO. 15-1100 |

<u>MEMORANDUM</u>

Dalzell, J.                                                                                    March 30, 2016

## I.      <u>Introduction</u>

Plaintiff Kenneth Wright was injured on March 5, 2013 while using a Ryobi Model RTS10 table saw, serial no. XX115150384. Wright brings a strict liability claim for design defect and failure-to-warn, a claim for breach of the implied warranty of merchantability, and a general negligence claim for failure-to-warn and negligent design. He also seeks punitive damages. Defendants Ryobi Technologies, Inc., Techtronic Industries North America, Inc., and One World Technologies, Inc., move for summary judgment on all of Wright's claims or, in the alternative, his (1) strict liability claim premised on the consumer expectations test, (2) strict liability and negligence claims with respect to the unfriendly nature of the blade guard assembly, (3) strict liability and negligence claims predicated on a failure-to-warn, and (4) punitive damages claim.

For the reasons explained below, we will grant in part defendants' motion for summary judgment with respect to Wright's strict liability claim for design defect predicated on the consumer expectations test, his strict liability and negligence claims with respect to both the blade guard assembly and failure-to-warn, and his punitive damages claim.

II.    **Standard of Review**

Fed. R. Civ. P. 56(a) provides:

> A party may move for summary judgment, identifying each claim
> or defense -- or the part of each claim or defense -- on which
> summary judgment is sought. The court shall grant summary
> judgment if the movant shows that there is no genuine dispute as to
> any material fact and the movant is entitled to judgment as a matter
> of law. The court should state on the record the reasons for
> granting or denying the motion.

A party moving for summary judgment bears the initial burden of informing the district

court of the basis for its argument that there is no genuine issue of material fact by identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted).

If the moving party meets this initial burden, then the non-moving party must show via

submissions beyond the pleadings that there are genuine factual issues for trial. Id. at 324. The

non-moving party must respond with facts of record that contradict the facts identified by the

moving party and may not rest on mere denials. Id. at 321 n.3.

There is a genuine issue of material fact only when there is sufficient evidence such that a

reasonable juror could find for the party opposing the motion. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 251-52 (1986) (explaining further that a mere scintilla of evidence is insufficient).

Material facts are those that would affect the outcome of the case under the governing law. Id. at

248. The Court may not make credibility determinations or weigh the evidence and must draw all

reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000); Amour v. County of Beaver, Pa., 271 F.3d 417, 420 (3d Cir.

2001). Our function is to determine whether there are genuine issues for trial, and we may not

prevent a case from reaching a jury simply because we favor one of several reasonable views of the evidence. <u>Abraham v. Raso</u>, 183 F.3d 279, 287 (3d Cir. 1999) (citing <u>Anderson</u>, 477 U.S. at 249).

### III.   **Factual Background**

On March 5, 2013, plaintiff Kenneth Wright accidentally severed the fingertips of his left thumb and middle finger while using a Ryobi Model RTS10 table saw, serial no. XX115150384. Wright Dep. at 120:10-24, 123:8-20; Defs' Mot. for Summ. J. ("MSJ") Exs. C & D ¶ 3. Wright's employer purchased the table saw about a year before the accident. Buonopane Dep. at 35:4-14. When purchased, the table saw included an Operator's Manual, a blade guard assembly, and a rip fence. <u>Id.</u> at 39:6-12, 40:4-9. Wright's employer believes that the blade guard assembly and Operator's Manual were both in the van at the job site on the day of the accident, but Wright believes that neither the blade guard assembly nor the manual were there that day. <u>Id.</u> at 39:16-24, 40:1-3, 42:13-18, 42:23 – 43:2; Wright Dep. at 94:15-24, 95:11-25, 96:1-7. Wright had never seen a blade guard for the table saw and never asked where it was, but he knew that the purpose of a blade guard was to protect the operator from coming into contact with the blade. <u>Id.</u> at 19:25-20:24, 95:2-17.

The table saw had on-product warning labels that said to "reduce the risk of injury, the user must read and understand the operator's manual"; to use the "blade guard and spreader for every operation for which it can be used, including all through sawing"; to "keep hands and body out of the path of the saw blade"; to "use a push stick when required"; to "pay particular attention to instructions on reducing risk of kickback"; and to "never perform any operation freehand". MSJ Ex. G (capitalizations omitted).

The Operator's Manual for the table saw warned that operators needed to carefully read and understand all of its instructions, keep the saw's guards in place and in good working order, and keep their hands away from the cutting area in order to avoid serious personal injury. MSJ Ex. H (Ryobi Operator's Manual) at 3. The manual continued that the operator needed to guard against kickbacks, always use a rip fence or straight edge when ripping, and use the blade guard, spreader, and anti-kickback pawls on all "through-sawing" cuts. Id. at 4. The manual also warned the operator to try to avoid kickbacks by keeping the rip fence parallel to the blade and using the blade guard, spreader, and anti-kickback pawls. Id. at 5.

The table saw Wright used was designed to be equipped with a modular blade guard assembly consisting, in part, of an adjustable/independent riving knife, a removable blade guard, and removable anti-kickback pawls. Hornick Aff. at ¶ 5. The blade guard provides a physical barrier between the table saw operator and the revolving blade and protects the operator from the top, side, and rear of the blade, leaving only a small opening at the front to allow the workpiece to make contact with the blade. Id. The purpose of the independent riving knife and anti-kickback pawls is to reduce the chance of kickback. Id.; Winter Dep. at 44:8-14. The table saw was designed to comply with all standards applicable to table saws as promulgated by the American National Standards Institute ("ANSI"), in conjunction with Underwriters Laboratories ("UL"), and included those warnings and labels ANSI/UL required. Hornick Aff. at ¶ 10. The modular guard on the table saw in question was mandated by ANSI/UL 987-2007, and was certified as being compliant therewith prior to its initial distribution. Id. at ¶ 11. Ryobi sells another table saw, the RTS21, that has a different system for keeping the rip fence aligned with the saw blade, but defendants maintain that by following the instructions on either the RTS21 or

the RTS10 the operator can align the rip fence parallel to the blade. Hornick Dep. at 35:6-22, 36:9-12, 39:4-23.

When using the RTS10 table saw in question, it was Wright's practice to keep the rip fence as parallel as possible to the blade in order to prevent kickbacks, which occur when the workpiece binds to the blade.[1] Wright Dep. at 27:9-22, 42:9-12. Wright knew the importance of keeping the rip fence parallel to the blade in order to prevent kickbacks because, when a kickback occurs, the workpiece could be thrown back at the operator or pull the operator's hand into the blade. Id. at 20:24 – 29:7, 27:9 – 28:2, 42:9-12. It was Wright's practice to use a tape measure to make sure that the rip fence was parallel to the blade. Id. at 50:20 – 51:23. He knew that he had to move the rip fence and adjust it to be parallel to the blade, and then had to lock the rip fence in place. Id. at 52:10-18. With respect to the table saw in question, Wright never saw the manual or the blade guard, but it was his practice to use a tape measure to ensure parallelism between the rip fence and the saw blade. Id. at 69:19-22, 70:13 – 71:12, 77:1-7. Although Wright does not specifically remember whether he used a tape measure to ensure parallelism before making the cut that led to his injury, he knows he "normally always set the rip fence," so he believes that he did, as was his normal practice. Id. at 106:6 – 108:17. It was also Wright's

---

[1] Wright first began woodworking in high school, doing odd jobs for a realtor. Wright Dep. at 16:12-14. He does not recall whether he used table saws, but he did use miter saws. Id. at 18:6-14. After high school, Wright began working in the flooring business, where he used table saws, circular saws, and miter saws. Id. at 20:25 – 21:5. In his first job, he used table saws to make rip cuts on plywood. Id. at 23:5-10. Wright cannot specifically recall whether he received instructions on how to use a table saw, but he is sure that he did. Id. at 24:18-22. In that first job, Wright knew the importance of keeping the rip fence as parallel as possible to the blade to prevent kickbacks. Id. at 27:14-23. Wright would use the rip fence to the best of his ability to keep the workpiece parallel to the blade. Id. at 29:21 – 30:6. In his next job, although Wright could not specifically recall using table saws, he is sure that he used them and that he would have continued to use the safety practices that he observed at his prior job with respect to guarding against kickbacks and keeping the rip fence parallel. Id. at 35:16 – 36:9. Wright held other jobs in carpet installation and woodworking and, by the time he began working for his employer at the time of the accident, he felt he knew how to use table saws safely. Id. at 58:15-24.

normal practice to keep his hands away from the blade as best he could because he knew he could be seriously injured by the blade. Id. at 19:15 – 20:24, 27:2-5.

At the time of the accident Wright was rip-cutting a piece of red oak, and using the rip fence, when the wood kicked back. Id. at 94:15-17, 104:5-15, 105:24 – 106:2, 119:12-25; MSJ Ex. D ¶ 5. Before the accident, Wright had adjusted the rip fence and made several rough cuts to ensure parallelism. Wright Dep. at 94:8-2, 107:2-7, 137:19-21. Although Wright believes that he had set up the saw properly and that it was safe to make a cut, the board nonetheless kicked back and his left hand hit the blade, severing the fingertips of his thumb and middle finger. Id. at 120:10-24, 123:8-20.

## IV.    **Discussion**

In Count I of the amended complaint, Wright alleges that the defendants are liable for his injury on a theory of strict liability because the saw was defective and in an unsafe condition as sold. Am. Compl. ¶ 15. Wright avers that the saw was in a defective and unreasonably dangerous condition because it was not equipped with a properly functioning rip fence or another physical barrier safety device that prevents access to the blade. Id. at ¶¶ 17-19. Wright believes that the saw could have had a safer alternative design, including a better guard system and a better designed rip fence using a tab-in-groove design. Id. at ¶ 32. Wright also argues that the saw is dangerous because it has a surprise element of danger. Id. at ¶¶ 36-37. In Count II of the amended complaint, Wright brings a claim for breach of the implied warranty of merchantability. Id. at ¶ 47. In Count III of the amended complaint, Wright alleges that the defendants are liable for his injuries on a negligence theory because they failed to properly design the saw's rip fence and failed to provide adequate warnings on how to operate the saw, among other alleged deficiencies. Id. at ¶¶ 51, 54. Wright also seeks punitive damages. Id. at ¶¶ 59-68.

The defendants move for summary judgment on all of Wright's claims, arguing that Wright's misuse of the table saw severs proximate cause between any alleged design defect and the accident that caused Wright's injury. MSJ Br. at 6. Defendants also argue, in the alternative, that they are not liable under a theory of strict liability using the consumer expectations test because the saw's dangers were knowable, reasonably anticipated, and appreciated by the ordinary consumer. Id. at 11. Defendants claim that they are not liable for failure-to-warn because the saw included adequate warnings, Wright was a knowledgeable user, and the danger in question was both open and obvious. Id. at 17-18. Defendants also move to dismiss Wright's claim for punitive damages because there is no evidence of wanton or reckless conduct. Id. at 23-24.

Wright responds that the defect in the rip fence, not any misuse of the saw on his part, caused the accident. Pl.'s Resp. in Opp. at 1. Wright also claims that the rip fence itself was unreasonably dangerous and defective because it would not reliably align and looks parallel to the blade when it is not, and is therefore a trap. Id. He also argues that the rip fence defect is not open and obvious, he is not a knowledgeable woodworker, and there was no adequate warning on the saw itself. Id. at 2. Finally, he avers that punitive damages are warranted because the defendants knew there was a class of consumers who would use the saw without the benefit of either the manual or the blade guard and they chose not to include a rip fence design that would prevent the rip fence from locking when not parallel to the blade. Id.

We first consider whether to grant defendants' motion as to all of Wright's claims on the grounds that subsequent mishandling severed proximate cause. Since, as explained below, we will not grant summary judgment on that basis, we will then consider defendants' remaining arguments for partial summary judgment.

**A.      Whether Removing The Blade Guard Was**
**Subsequent Mishandling Within The Meaning Of Section 402A**

We must first inquire whether subsequent mishandling or other causes rendered the table

saw harmful by the time it reached Wright. Restatement (Second) of Torts § 402A cmt. g. The

parties do not dispute that when Wright was using the saw during his accident, the blade guard

assembly had already been removed, but the rip fence was still in place. Wright Dep. at 94:8-2,

94:15-17, 105:24 – 106:2, 107:2-7, 137:19-21. Defendants argue that Wright's injury was caused

by performing a rip cut without the blade guard assembly in place. MSJ Br. at 11. Wright argues

that his injury was caused by the rip fence. Pl.'s Resp. in Opp. at 8.

A seller is not liable when it delivers a product in a safe condition and subsequent

mishandling or other causes make it harmful by the time it reaches the consumer. Restatement

(Second) of Torts § 402A cmt. g. The injured plaintiff bears the burden of proving that the

product was in a defective condition when it left the seller's control. Id. Although evidence of a

user's negligence cannot be introduced at trial to excuse a defective product or to reduce

recovery by comparing fault, a plaintiff's conduct in a strict products liability action may be

relevant as it relates to causation. Madonna v. Harley Davidson, Inc., 708 A.2d 507, 508 (Pa.

Super. Ct. 1998). But a user's negligence is not relevant if the product defect contributed in any

way to the harm. Id. at 509. A plaintiff in a strict liability action must prove that the product was

defective and that the defect was the proximate cause of his injury. Id. at 508 (citing Walton v.

Avco Corp., 610 A.2d 454, 458 (Pa. 1992)). Assumption of risk, product misuse, and highly

reckless conduct are all affirmative defenses for which the defendant bears the burden of proof.

Reott v. Asia Trend, Inc., 55 A.3d 1088, 1092 (Pa. 2012).

8

In Pennsylvania, evidence of misuse is generally admissible to defeat causation in a strict products liability design defect case. Moyer v. United Dominion Indus., Inc., 473 F.3d 532, 542 (3d Cir. 2007). Misuse involves a plaintiff's "unforeseeable, outrageous, and extraordinary use of a product." Nathan v. Techtronic Indus. N. Am., Inc., 92 F. Supp. 3d 264, 275 (M.D. Pa. 2015) (quoting Reott v. Asia Trend, Inc., 55 A.3d at 1097). The defendant bears the burden of proving that the use was so unforeseeable or outrageous that it was a sole or superseding cause of the injury. Id. (citing Parks v. AlliedSignal, Inc., 113 F.3d 1327 (3d Cir. 1997), and Reott v. Asia Trend, Inc., 7 A.3d 830, 836 (Pa. Super. 2010)). Since misuse and causation are questions of fact, summary judgment is proper only if the material facts are not in dispute. Id. As was the case in Nathan, the defendants here assert that Wright's accident would not have occurred if the blade guard assembly had been in place, and so they must show that there is no genuine dispute that the blade guard assembly would have prevented the accident. Id.; see also Hollinger v. Wagner Mining Equip. Co., 667 F.2d 402, 407 (3d Cir. 1981) (explaining that if the presence of a certain safety feature would not have prevented the accident in question, then its removal could not be considered a substantial change so as to preclude liability).

The parties agree that Wright's cause of action based upon the allegedly unfriendly nature of the blade guard assembly itself can be dismissed. Pl.'s Resp. in Opp. at 2; MSJ Br. at 16-17. But the question remains as to whether using the table saw without the blade guard severs the causal link between an alleged defect in the rip fence and Wright's injury. Where reasonable minds may differ, questions of causation and proximate cause are for a jury to decide. Summers v. Certainteed Corp., 997 A.2d 1152, 1164 (Pa. 2010).

Wright was injured while making a rip cut on a piece of red oak when it kicked back, pushing his hand into the saw blade. Wright Dep. at 104:5-15, 119:12-25; MSJ Ex. D ¶ 5. A rip

cut is a type of through-cut for which the blade guard assembly can be used. MSJ Ex. H at 4. Because the blade guard assembly was not on the saw at the time of the cut, the plastic barrier guard, the anti-kickback pawls, and the riving knife were therefore not being used, which defendants believe constitutes misuse by Wright. MSJ Br. at 8.

Les Winter, Wright's expert, testified that the type of cut Wright was making at the time of his accident was the type of cut for which the barrier guard does not need to be removed. Winter Dep. at 39:14-21. Similarly, the riving knife and anti-kickback pawls could have been in place. Id. at 43:21 – 44:7, 49:6 – 50:5. Winter opined that "Had the guard been provided, [it] probably would have had a different outcome." Id. at 60:15-16. He also stated that, while he did not know why Wright's employer removed the guard, "I know that it should not have been removed." Id. at 62:23-25. Winter's analysis led him to believe that Wright's injury was caused by a kickback, and that the chances of the kickback occurring would be "[r]eally greatly reduced" if a riving knife had been in place. Id. at 73:1-8, 74:14-19.

Winter also testified that, to a reasonable degree of professional certainty, the most probable cause of the kickback was that the rip fence was misaligned with the saw blade. Id. at 74:24 – 76:7, 98:4-13. Winter opined that the blade guard should have been present, and if Wright had been "operating the saw with a guard and with the rip fence positioned the way it should be, the injury would not have occurred." Id. at 170:11-15, 190:10-20. He similarly believed that the accident would "[p]robably not" have happened if Wright had been operating the saw "with a guard but the rip fence in the condition it was at the time of the accident." Id. at 170:16-21. Winter said that it was unlikely, given what Wright was cutting, that a kickback would have occurred if there was no blade guard in place but the rip fence was perfectly aligned. Id. at 170:20 – 171:6.

Winter's testimony demonstrates that there is a dispute of material fact as to what proximately caused Wright's injury. Wright was injured when the piece of red oak he was rip-cutting kicked back and pushed his hand into the blade. Wright argues that, but for the allegedly defective rip fence's failure to align parallel to the blade, no kickback would have occurred. Defendants counter that, but for Wright's failure to use the blade guard barrier or other safety features, his hand would not have come into contact with the blade and he would not have been injured -- presumably even if the rip fence was not parallel to the blade. Winter's testimony supports both interpretations. Although in a strict products liability case the plaintiff's negligence or contributory negligence is not at issue, such evidence does bear on causation. Reasonable minds may differ on the proximate cause of Wright's injury given that standard, and so there is a triable issue regarding causation. We will therefore deny defendants' motion for summary judgment on this basis.

We turn to defendants' remaining arguments for partial summary judgment.

### B.    Count I: Strict Products Liability

In a strict products liability action, a plaintiff must show that (1) the product was defective, (2) the defect proximately caused the plaintiff's injury, and (3) the defect existed at the time the product left the defendant's control. Pavlik v. Lane Ltd./Tobacco Exp. Int'l, 135 F.3d 876, 881 (3d Cir. 1998). Three types of defective conditions give rise to a strict products liability claim: design defects, manufacturing defects, and failure-to-warn defects. Phillips v. A-Best Prods. Co., 665 A.2d 1167, 1170 (Pa. 1995).  To satisfy the second prong regarding causation in a failure-to-warn case, the plaintiff must establish that it was the total lack or insufficiency of a warning that was both a cause-in-fact and the proximate cause of the injuries. Pavlik, 135 F.3d at 881. A product is defective due to a failure-to-warn if the product was distributed without

sufficient warnings to notify the ultimate user of the dangers inherent in the product. Phillips v.

A-Best Prods. Co., 665 A.2d at 1171 (citing Mackowick v. Westinghouse Elec. Corp., 575 A.2d

100, 102 (Pa. 1990)).

      The strict products liability portion of the amended complaint is governed by the

Restatement (Second) of Torts § 402A. See Tincher v. Omega Flex, Inc., 104 A.3d 328, 335 (Pa.

2014) (declining to adopt the Restatement (Third) of Torts: Products Liability §§ 1 et seq.). A

plaintiff pursuing a strict products liability claim must first prove that the product was in a

"defective condition." Id. Section 402A(1) provides:

> One who sells any product in a defective condition unreasonably
> dangerous to the user or consumer or to his property is subject to
> liability for physical harm thereby caused to the ultimate user or
> consumer, or to his property, if
> (a) the seller is engaged in the business of selling such a product,
> and
> (b) it is expected to and does reach the user or consumer without
> substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1). Because this is a strict liability rule, it applies even if

the seller has exercised all possible care in the preparation and sale of the product and the user or

consumer has not bought the product from, or entered into any contractual relationship with, the

seller. Id. at § 402A(2) & cmt. a. The injured plaintiff bears the burden of proving that the

product was in a defective condition when it left the seller's control. Id. at cmt. g.

      Section 402A only applies when the defective condition of the product makes it

unreasonably dangerous to the user or consumer, meaning it is dangerous to an extent beyond

that which would be contemplated by the ordinary consumer, imbued with the ordinary

knowledge common to the community, who purchases it. Id. at cmt. i. To prevent a product from

being unreasonably dangerous, the seller may be required to give directions or warnings as to its

use. Id. at cmt. j. If warnings are given, then the seller may reasonably assume that they will be

read and heeded, and a product with such warnings, if safe for use when followed, is not in a defective condition or unreasonably dangerous. Id. Because Section 402A is a strict liability rule, the contributory negligence of the plaintiff is not a defense when the negligence consists of merely failing to discover a defect in the product or to guard against the possibility of its existence. Id. at cmt. n. But where a plaintiff's contributory negligence is in the form of voluntarily and unreasonably proceeding to encounter a known danger, it is a defense. Id.

Although evidence of a user's negligence cannot be introduced at trial to excuse a defective product or to reduce recovery by comparing fault, a plaintiff's conduct in a strict products liability action may be relevant as it relates to causation. Madonna, 708 A.2d at 508. A plaintiff bringing a strict products liability claim must prove that the product was defective and that the defect was the proximate cause of his injury. Id. (citing Walton v. Avco Corp., 610 A.2d 454, 458 (Pa. 1992)). But a user's negligence is not relevant if the product defect contributed in any way to the harm. Id. at 509. Assumption of risk, product misuse, and highly reckless conduct are all affirmative defenses for which the defendant asserting them bears the burden of proof. Reott v. Asia Trend, Inc., 55 A.3d at 1092. Highly reckless conduct is that which occurs when the plaintiff would have been injured despite the curing of any alleged defect, or it is so extraordinary and unforeseeable as to constitute a superseding cause. Id. at 1101 (citing Madonna, 708 A.2d at 509). Where reasonable minds may differ, questions of causation and proximate cause are for a jury to decide. Summers, 997 A.2d at 1164.

In Pennsylvania, a plaintiff can prove a defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer (the consumer expectations test), or (2) a reasonable person would conclude that the probability and seriousness

of harm caused by the product outweigh the burden or costs of taking precautions (the risk-utility test). <u>Tincher</u>, 104 A.3d at 401.

The consumer expectations test defines a defective condition as a condition, upon normal use, dangerous beyond the reasonable consumer's contemplations. <u>Id.</u> at 387. A product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer. <u>Id.</u> A product is not defective if the ordinary consumer would reasonably anticipate and appreciate the dangerous condition of the product and the attendant risk of injury of which the plaintiff complains. <u>Id.</u> The nature of the product, the identity of the user, the product's intended use and user, and any express or implied representations by the manufacturer or other seller are among the relevant considerations when assessing the reasonable consumer's expectations. <u>Id.</u>

The risk-utility test is a cost-benefit analysis. <u>Id.</u> at 389. A product is in a defective condition if a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. <u>Id.</u> A seller's precautions to alert the consumer to the danger should anticipate and reflect the type and magnitude of the risk posed by the sale or use of the product. <u>Id.</u> Factors relevant to this risk-utility analysis include: (1) the product's usefulness and desirability, (2) its safety aspects, (3) the availability of a substitute product which would meet the same need and not be as unsafe, (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, (5) the user's ability to avoid danger by exercising care when using the product, (6) the user's anticipated awareness of the dangers inherent in the product either because of general public knowledge of the obvious condition of the product, or because of the existence of suitable warnings and instructions, and (7) the

14

feasibility of spreading the loss by setting the price of the product or carrying liability insurance. Id. at 389-90.

With respect to the consumer expectations test, defendants argue that the danger of the table saw's rotating blade was both known and acceptable to Wright. MSJ Br. at 13-14. They also argue that the ordinary consumer would reasonably anticipate and appreciate the saw's dangerous nature. Id. at 14. Further, the Operator's Manual included warnings on setting up and adjusting the rip fence and how to avoid kickbacks. Id. at 15. Wright argues that "the failure of the rip fence to reliably self-align was the relevant danger of this table saw, not the rotating blade." Pl.'s Resp. in Opp. at 8-9.[2]

### 1.    Whether The Rip Fence Is Defective Under The Consumer Expectations Test

Pursuant to the consumer expectations test, we ask whether the danger of the rip fence was unknowable and unacceptable to the average or ordinary consumer, or whether the ordinary consumer would reasonably anticipate and appreciate the dangerous condition of the product.

A table saw is meant to cut wood and wood composition products, excluding large panels, in straight line cutting operations such as cross-cutting, ripping, mitering, beveling, and compound cutting. MSJ Ex. H at 24. The intended user is, by extension, a person engaged in woodworking activities. Id. Wright falls within this class of intended user and, at the time of the

---

[2] The parties agree that Wright's claims based upon the allegedly unfriendly nature of the blade guard assembly itself can be dismissed. Pl.'s Resp. in Opp. at 2; MSJ Br. at 16-17. We will therefore dismiss those portions of the complaint and omit discussion of the blade guard assembly.

The parties do not really dispute that the average or ordinary consumer can reasonably anticipate and appreciate the danger of a rapidly rotating blade on a table saw. MSJ Br. at 14 ("It cannot be reasonably disputed that a table saw, by virtue of its very nature (having a blade that rotates at a speed of up to 5,000 RPM) and purpose (to cut through wood "like a knife through butter"), encompasses hazards that are open and obvious."); Pl.'s Resp. in Opp. at 8-9 (arguing that the relevant danger of the table saw was the rip fence, not the rotating blade). We therefore discuss the saw blade's danger only insomuch as it relates to the nature of the rip fence.

accident, was using the table saw for its intended purpose. Wright's identity as the user in this case is fairly characterized as an experienced table saw user and carpenter, although perhaps not a table saw "expert."[3]

The purpose of the rip fence is to assist the table saw operator with keeping the workpiece parallel to the blade. MSJ Ex. H at 29. The rip fence runs along the length of the table saw's surface and can be adjusted to accommodate wider or narrower pieces of wood. Id. Once the operator moves the rip fence to the desired distance from the blade, a locking lever allows the operator to secure the rip fence. Id. To check the alignment, the operator is supposed to use a framing square and take dimensions to ensure that the rip fence is the same distance from the blade across the length of table saw, meaning that it is parallel. Id. at 39. The operator is also instructed to make test cuts to make sure the rip fence is properly aligned. Id. The rip fence itself does not protect the operator from the dangers of the blade. Rather, it assists the operator in using the table saw in a manner that reduces the likelihood of a kickback, which can endanger the operator by either throwing the workpiece backward into the operator's face and body or by drawing the operator's hands into the blade.

In a strict products liability design defect claim, the plaintiff must establish that the product was unsafe for its intended user. Phillips v. Cricket Lighters, 841 A.2d 1000, 1007 (Pa. 2003). A manufacturer cannot be held strictly liable for failing to design a product that was safe

---

[3] Wright argues that he was not a knowledgeable user because he had never seen a blade guard assembly or read a manual for a table saw. Pl.'s Resp. in Opp. at 16-17. Wright's expert testified that woodworkers typically underestimate the likelihood of injury, the extent of any possible injury, and how quickly a kickback occurs. Winter Dep. at 142:5-9. Winter did not think Wright had a superior understanding of table saws compared to other people because Wright is a carpenter, not a table saw expert. Id. at 145:3-19. But Wright's deposition reveals that Wright's own perception of his skill level is that he is an experienced table saw user, and that his work experience supports that perception. See supra n.1. Winter's testimony that Wright was not a table saw expert or that he did not have a superior understanding of table saws does not create a dispute of material fact regarding Wright's experience and competence in using table saws.

for use by any reasonably foreseeable user: the intended user is the only relevant user in that analysis. Id. The average and ordinary consumer, a person engaged in some form of carpentry, would know and appreciate the dangers posed by the rip fence after reading the seller's warnings and instructions in the Operator's Manual. Even though Wright himself did not read the manual, his experience and normal practices when using table saws with rip fences demonstrate that he understood the danger inherent in a rip fence that was not properly aligned with the saw blade. The manual explains what the rip fence does, how the operator must align it with the blade, and how the operator must then measure to verify that the alignment is parallel. The rip fence itself, when used in accordance with the seller's instructions, is not unreasonably dangerous or defective. A seller may reasonably assume that its warnings and instructions will be read and heeded, and that a product with such warnings, if safe for use when the instructions are followed, is not in a defective condition or unreasonably dangerous.

Wright does not point to any evidence that the table saw in question purports to have a self-aligning feature, but rather relies on his expert's testimony that the design of this saw's rip fence does not reliably "lock up square" or "self-align," and that this is due to a design defect since other saws made by Ryobi and other manufacturers do self-align. Winter Dep. at 30:8-31:8. Winter believes that a manufacturer can design a rip fence that reliably self-aligns in several ways. Id. Winter clarified that the defect is not the omission of any particular alignment system, but rather the failure of the rip fence to "self-align." Id. at 97:17-22. Winter suggested that the RTS10 table saw's rip fence is easy to misalign, whereas other saws are much more resistant to misalignment. Id. at 100:17-23. Winter also admitted that the manufacturer never claimed that the table saw in question self-aligned. Id. at 103:7-12.

17

Defendants never made any express or implied representation that the rip fence self-aligned, and in fact provided directions and warnings in the manual directing operators to check the alignment of the rip fence and saw blade to ensure parallelism. Within the context of the consumer expectations test, a rip fence that does not self-align, and does not purport to self-align, is not a trap: the manufacturer makes clear the benefit of the rip fence can only be realized by the operator if the operator uses it correctly, and such proper use requires independently ensuring parallelism between the blade and the rip fence after locking down the rip fence. The reasonable consumer would not expect a rip fence that did not purport to self-align to be a self-aligning rip fence. Wright's expert's arguments about the saw's relative resistance to misalignment compared to other saws bears on the risk-utility test, but not in this case on the consumer expectations test.

We will therefore grant defendants' partial motion for summary judgment to the extent that there is no triable issue of fact regarding the consumer expectations test theory of liability for Wright's strict products liability claim alleging a design defect in the rip fence. But defendants did not move for summary judgment on the risk-utility theory of liability for this claim, and so there is a triable issue of fact for a jury on whether, under that alternate theory of strict liability, the rip fence is defective.

>
> **2.      Whether The Alleged Failure-To-Warn
>           Caused-In-Fact And Proximately Caused Wright's Injury**

In a strict products liability case, even if a plaintiff can satisfy the first step and show -- using either the consumer expectations test or the risk-utility test -- that the product was defective, the plaintiff must also show that the alleged defect caused his injuries. In the context of a failure-to-warn case, to show causation the plaintiff must establish that it was the total lack or insufficiency of a warning that was both a cause-in-fact and the proximate cause of his

injuries. Pavlik, 135 F.3d at 881. A product is defective due to a failure-to-warn when the product is distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product. Phillips v. A-Best Prods. Co., 665 A.2d at 1171. A plaintiff raising a failure-to-warn claim must establish both that (1) the product was sold in a defective condition unreasonably dangerous to the user, and (2) the defect caused the plaintiff's injury. Id. To establish that a product was defective, a plaintiff must show that a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency made the product unreasonably dangerous. Id. To establish causation, a plaintiff must demonstrate that he would have avoided the danger had he been warned of it by the seller. Id. If a plaintiff fails to establish either of these two elements, then he is barred from recovery as a matter of law. Id.

Defendants argue that Wright was independently knowledgeable about keeping the rip fence parallel to the blade, and that the comprehensive warnings in the manual discharged their duty to warn. MSJ Br. at 22-23. Wright's expert opined that the table saw's warnings are deficient because they are contained only in the manual, and not on the rip fence itself, and that the warnings in the manual do not fully explain the consequences of the rip fence design -- namely, that it will not automatically align and the dangers it therefore poses to the operator. Winter Dep. at 33:2-13. To reach a jury on a failure-to-warn theory of liability, the evidence must support a reasonable inference, and not just a guess, that the existence of an adequate warning would have prevented the injury. Pavlik, 135 F.3d at 881.

Wright has failed to provide evidence supporting a reasonable inference that the existence of an adequate warning would have prevented his injury. As Wright admits he never read the Operator's Manual, the purported inadequacy of the unread warnings therein could not have caused his injury. Nor has Wright provided any evidence that a warning on the rip fence itself

would have prevented the injury in question. Wright used a tape measure, his usual method, to check the alignment of the rip fence relative to the saw blade and then made several test cuts to check the parallelism before making the cut into the red oak board that led to his injury. It is mere speculation by Wright's expert that a warning on the rip fence itself -- say, that the operator needed to independently verify the alignment to avoid a kickback that could lead to serious injury -- would somehow have altered Wright's behavior or otherwise prevented the accident, given that Wright actually did independently verify the alignment. Because there is no triable issue of fact regarding causation -- regardless of the theory underpinning the alleged defect for failure-to-warn -- we will grant summary judgment on this claim.

### C.   **Negligence Claims (Count III)**

In Count III of the amended complaint, Wright alleges that the defendants are liable for his injuries on a negligence theory because they failed to properly design the saw's rip fence and failed to provide adequate warnings on how to operate the saw, among other alleged deficiencies. Id. at ¶¶ 51, 54. Defendants did not move for summary judgment on Wright's negligent design claim, and so there remain triable issues of fact for a jury. But defendants did move for summary judgment on Wright's negligence claim for failure-to-warn. MSJ Br. at 17.[4]

To prevail in a negligence action, a plaintiff must show that (1) the defendant owed a duty of care, (2) the breach of which (3) caused (4) damages. Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 61 (3d Cir. 2009). Under Pennsylvania law, a claim for negligence under a failure-to-warn theory in products liability requires showing, unlike in a strict products liability claim,

---

[4] Although we have granted summary judgment on Wright's strict products liability claims for failure-to-warn, that holding does not dictate the result of our negligence analysis. See Phillips v. Cricket Lighters, 841 A.2d at 1008 (strongly rejecting the legal theory that summary judgment on a strict liability claim perforce entitles the defendant to summary judgment on a related negligence claim).

that the manufacturer was at fault. Dauphin Deposit Bank & Tr. Co. v. Toyota Motor Corp., 596 A.2d 845, 849-50 (Pa. Super. Ct. 1991). But, as is the case with a strict products liability claim for failure-to-warn, a plaintiff must also show that the absence or inadequacy of the warnings was the factual or proximate cause of the injury. Moroney v. General Motors Corp., 850 A.2d 629, 633-34 (Pa. Super. Ct. 2004). The initial determination of whether a warning is adequate in Pennsylvania is a matter of law. Pavlik, 135 F.3d at 886.

As we previously discussed, Wright has failed to provide evidence to support a reasonable inference, and not just a guess, that either the absence or inadequacy of the warnings was the factual or proximate cause of his injury. Wright never read the manual, and so the purported inadequacy of the warnings therein could not have caused his injury. Wright has also failed to point to any evidence rebutting defendants' assertion that nothing in the record demonstrates that the allegedly inadequate warnings or lack of warnings caused his injuries. Wright checked the alignment of the rip fence using a tape measure before making the cut that led to his injury. It is mere speculation by Wright's expert that a warning on the rip fence itself would somehow have changed Wright's behavior or otherwise prevented the accident. This is the type of conjecture that, at most, constitutes a mere scintilla of evidence, and that scintilla does not suffice to create a triable issue of fact for a jury.

We will therefore grant defendants' motion for summary judgment on Wright's negligence claim for failure-to-warn. But Wright may proceed to trial on his negligent design claim, as well as his breach of the implied warranty of merchantability claim.[5]

---

[5] In Count II of the amended complaint, Wright brings a claim for breach of the implied warranty of merchantability. Am. Compl. at ¶ 47. Pennsylvania's implied warranty of merchantability requires merchantable goods to be of fair or average quality within the description and fit for the ordinary purpose for which such goods are used. 13 Pa. C.S. § 2314(a), (b)(2)-(3). The implied warranty of merchantability protects buyers from loss where the goods purchased are below commercial standards or unfit for the buyer's purpose. Altronics of

### D.   __Punitive Damages__

State law governs the legal standard for punitive damages. Griffiths v. CIGNA Corp., 857

F. Supp. 399, 409-10 (E.D. Pa. 1994), aff'd, 60 F.3d 814 (3d Cir. 1995). In Pennsylvania, the

Restatement (Second) of Torts § 908(2) governs the imposition of punitive damages. Rizzo v.

Haines, 555 A.2d 58, 69 (Pa. 1989). Punitive damages are meant to punish and deter the

tortfeasor and those like the tortfeasor. Restatement (Second) of Torts § 908(1). Punitive

damages may be awarded because the defendant's conduct was outrageous, or because the

defendant's motive was evil, or because of the defendant's reckless indifference to the rights of

others. Id. at § 908(2). Punitive damages are only warranted for conduct that is malicious,

wanton, reckless, willful, or oppressive. Rizzo, 555 A.2d at 69. We focus on the act itself, the

surrounding circumstances, the motive of the wrongdoer, and the relation of the parties. Id. The

tortfeasor's state of mind is relevant, and the act or omission must be intentional, reckless, or

malicious. Id.

Since punitive damages are meant to punish and deter a defendant -- not compensate the

plaintiff -- such exemplary damages may only be awarded for conduct involving some element

of outrage similar to that usually found in crime. Restatement (Second) of Torts § 908 cmt. b.

Conduct is outrageous when done with an evil motive or reckless indifference to the rights of

---

Bethlehem v. Repco, Inc., 957 F.2d 1102, 1104 (3d Cir. 1992). To establish such a breach, a
plaintiff must show that the equipment purchased from the defendant was defective. Id. A
plaintiff bears the burden of demonstrating that (1) the product malfunctioned, (2) plaintiff used
the product as intended or reasonably expected by the manufacturer, and (3) the absence of other
reasonable secondary causes. Id.
Defendants have not moved for summary judgment on this particular claim, except to the
extent that they moved for summary judgment based on Wright's alleged misuse of the saw by
operating it without a blade guard assembly in place. MSJ Br. at 1. Because we have denied
defendants' motion for summary judgment on that basis, there remain triable issues of fact for a
jury on this claim.

others. Id. Reckless indifference to and conscious action in deliberate disregard of the rights of others may provide the requisite state of mind to justify punitive damages. Id. Punitive damages are not awarded for mere inadvertence, mistake, or errors of judgment constituting ordinary negligence. Id. The trier of fact can only award punitive damages if there has been bad motive or wanton indifference. Id. at cmt. d.

Damages under Section 908 are not justified when the defendant's mental state rises to no more than gross negligence. SHV Coal, Inc. v. Continental Grain Co., 587 A.2d 702, 705 (Pa. 1991). Only reckless conduct of the kind where the actor knows, or has reason to know, of facts that would create a high degree of risk of physical harm to another, followed by the deliberate action or inaction in conscious disregard or indifference to that risk, is sufficient to create a jury question on the issue of punitive damages. Id.

Wright seeks punitive damages because he believes that the defendants acted in wanton and reckless disregard for his safety by making no changes in the design or manufacture of RTS10 table saws that would have prevented amputation injuries and that such conduct shocks the conscience. Am. Compl. ¶¶ 64-68. Defendants argue that Wright has not pled the requisite elements for punitive damages under Pennsylvania law -- specifically with respect to reckless indifference. MSJ Br. at 24. Wright responds, based on certain statements from Hornick, the RTS10 product manager, that he has demonstrated by a preponderance of the evidence that defendants' conduct was outrageous. Pl.'s Resp. in Opp. at 23-25.

In Exhibit C to Wright's proposed sur-reply, Wright offers citations to the record to support his claim for punitive damages. Pl.'s Sur-Reply Ex. C. His citations include Hornick's deposition testimony as well as Winter's deposition testimony about the feasibility of alternate designs for the RTS10, along with a number of legal conclusions. See, e.g., Pl.'s Sur-Reply Ex.

C at unnumbered p.1 ("Defendant's [sic] ignored and willfully endangered an entire class of consumers, including plaintiff, who through no fault of their own, do not have access to the product manual or blade guard."). Wright then cites to several portions of Hornick's deposition without explanation. Id. Such conclusions, styled as citations to the record, do not satisfy Wright's obligation to show, via submissions beyond the pleadings, that there are genuine factual issues for trial or his obligation to respond with facts of record that would contradict the facts the moving party identified. Celotex Corp., 477 U.S. at 321 n.3, 323-24. Wright's references to his expert's testimony that the RTS21 has an allegedly safer design than the RTS10 is not evidence that defendants acted with the degree of culpability required for punitive damages. Wright's references to Hornick's deposition testimony regarding the possibility that the RTS10 rip fence can be locked down without being parallel to the blade is similarly insufficient.[6]

Punitive damages are not justified when the defendant's mental state rises to no more than gross negligence, and there is only a jury question on this issue if the defendant's conduct was reckless because it knew, or had reason to know, of facts creating a high degree of risk of physical harm to another and then deliberately acted or failed to act in conscious disregard of, or with deliberate indifference to, that risk. SHV Coal, Inc., 587 A.2d at 705. Wright has not pointed to any evidence in the record supporting this contention and thus there is no triable issue

---

[6] Though such an activity is unsuitably porcine for a district court, we perused Hornick's deposition, as cited to in Wright's counter-statement of facts, for whatever truffles might support a punitive damages claim. See, e.g., United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (delighting judges with a pithy retort when parties do not cite to the record with adequate specificity). We give no weight to Wright's legal conclusions when proffered to counteract defendants' citations to a total lack of evidence in the record to support a claim for punitive damages. Further, after reviewing the facts that purport to support such a claim, we find them insufficient to create a triable issue of fact for a jury.

of fact for a jury. We will therefore grant defendants' motion for summary judgment with respect to Wright's claim for punitive damages.

**V.      Conclusion**

We will grant summary judgment with respect to Wright's strict products liability claim for design defect under the consumer expectations test, and Wright's strict products liability and negligence claims for failure-to-warn. We will dismiss, by consent of the parties, Wright's claims with respect to the allegedly unfriendly nature of the blade guard assembly. We also grant summary judgment with respect to Wright's claim for punitive damages. An appropriate Order follows.

BY THE COURT:

  /s/ Stewart Dalzell, J.
Stewart Dalzell, J.